UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KIMBERLY ANN OLAH-LAPASH**,                Case No. 1:10 CV 1287

    Plaintiff,                         Judge Patricia A. Gaughan

    v.                                  REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                          Magistrate Judge James R. Knepp II

## Introduction

Plaintiff Kimberly Ann Olah-Lapash seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3).

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## Background

Plaintiff filed an application for DIB and SSI, alleging disability since May 2005. (Tr. 91, 95). After a hearing where Plaintiff, her attorney, and a vocational expert appeared, an administrative law judge (ALJ) denied Plaintiff's claims. (Tr. 10-21). The ALJ found Plaintiff retained the residual functional capacity (RFC) to return to her past work as a fast food worker. (Tr. 21). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. 20 C.F.R. §§ 404.955, 404.981; 416.1455, 416.1481.

*Treatment History*

Plaintiff was diagnosed with new onset diabetes in November 2004. (Tr. 282). In July 2005, she visited the emergency room, complaining of numbness and weakness mostly in her lower thigh and reporting no prior neurologic problems. (Tr. 325). Her physical examination revealed full range of motion in the cervical spine and motor strength in her arms and legs ranging from 4/5 to 5/5. (Tr. 326). In August 2005, Plaintiff reported to neurologist Darshan Mahajan that she had been experiencing numbness in her legs since late July 2005. (Tr. 336). Other than decreased pinprick and temperature sensation below the knees and elbows, neurological findings were normal, including normal muscle tone, power, reflexes, and gait. (Tr. 339). Dr. Mahajan's impression was that Plaintiff had peripheral neuropathy due to her diabetes mellitus, Type II, and ordered laboratory testing and physical therapy. (*Id.*).

In August 2005, Plaintiff began receiving mental health services at the Nord Center. (Tr. 171-88). During her initial mental status examination, the staff counselor indicated her estimated intelligence was "borderline". (Tr. 186).

A cervical spine x-ray and MRI taken later that month showed only minimal degenerative changes. (Tr. 333, 340). Plaintiff started physical therapy on August 25, 2005, and exhibited muscle strength in her arms and legs ranging from 4/5 to 5/5, with the exception of 3+ strength in her right thumb, and 3- to 3+ strength in her lower abdominals, gluteous maximus, and scapular muscles. (Tr. 190). Plaintiff returned for physical therapy on August 30 and September 6, 2005. (Tr. 193-94). Her therapist noted she tolerated her treatment well, and after therapy she reported her shoulder felt "looser" and her numbness and tingling in her feet decreased. (*Id.*).

On September 8, 2005, Plaintiff applied for disability benefits. (Tr. 91, 95). In her disability paperwork, Plaintiff reported she did housework, prepared easy meals like soup and sandwiches,

shopped for groceries monthly, drove a car, took care of pets, and watched TV most of the day. (Tr. 132-34).

Plaintiff skipped her physical therapy sessions on September 9, 13, 15, and 29. (Tr. 192-94). After receiving a warning, she was discharged due to lack of attendance. (Tr. 189, 192).

Plaintiff returned to Dr. Mahajan for follow-up on September 28, 2005, reporting she quit physical therapy because she started to feel worse and did not want to continue her home exercises. (Tr. 337). Dr. Mahajan noted her strength was "well maintained", her balance was "good", and she was "ambulating relatively well". (*Id.*).

Plaintiff returned to the Nord Center on September 1 and October 18, 2005, but failed to keep her October 26, 2005 Nord Center appointment. (Tr. 473-75). She did not return to the Nord Center until February 2006. (Tr. 472).

Psychologist Thomas Zeck performed a consultative examination of Plaintiff in November 2005. (Tr. 209-14). Testing indicated Plaintiff had a verbal IQ of 75, a performance IQ of 79, and a full scale IQ of 75, putting her within the borderline range of intelligence. (Tr. 213). Dr. Zeck diagnosed Plaintiff with depressive neurosis, not otherwise specified, and borderline intellectual functioning. (Tr. 214). He opined Plaintiff's work-related mental abilities were moderately impaired in her ability to relate to others; to understand, remember, and follow instructions; and withstand the stress and pressures of day-to-day work activities. (*Id.*). He opined that her mental ability to maintain attention, concentration, persistence, and pace for simple, repetitive tasks was not impaired, and she was capable of comprehending and doing simple, routine tasks at home and in the community. (*Id.*).

In December 2005, Dr. David DeMuth reviewed the evidence and opined that Plaintiff had

3

depressive neurosis, not otherwise specified, and borderline intellectual functioning. (Tr. 236-37). He opined she would be capable fo simple, routine tasks in a familiar environment, have no problems getting along with others on the job, and do best in a low stress setting with minimal demands. (Tr. 249).

In December 2005, Dr. E.S. Villanueva opined Plaintiff could perform a range of medium exertional work. (Tr. 252).

Plaintiff sought emergency care in December 2005 for an upper respiratory infection and asthma. (Tr. 299). Physical examination revealed her musculoskeletal system was within normal limits and her reflexes were grossly intact. (Tr. 295).

In February 2006, Plaintiff returned to the Nord Center for treatment. Dr. Dilbagh Saini noted Plaintiff had not been hospitalized or taken psychotropic medications since the 1990s. (Tr. 467). Dr. Saini noted Plaintiff was depressed and felt hopeless, but her affect was reactive and full range at times, she was not suicidal or hallucinating, and her insight and judgment were fair. (Tr. 468). He diagnosed her with major depression, moderate. (*Id.*). He discussed starting Plaintiff on Paxil, an anti-depressant. (*Id.*).

Dr. Issam Al-Turk conducted a physical consultative examination in April 2006. (Tr. 223-30). During physical examination, he noted Plaintiff exhibited stable gait; normal mental status; normal range of motion throughout her back, legs, shoulders, and arms; and normal neurological findings, including normal light touch and pin-prick responses. (Tr. 224-25). He noted multiple prescription medications, but nothing other than aspirin for pain. (Tr. 223). Dr. Al-Turk opined Plaintiff would have no difficulty with work-related activities, and her ability to sit, stand, walk, lift, carry, and handle would not be affected. (Tr. 226).

In April 2006, Plaintiff changed her primary care provider to Dr. Rebecca Schroeder at Lorain County Health and Dentistry.  (Tr. 442).  That same month, Dr. Saini noted Plaintiff had not been taking the Trazadone prescribed to her "but now agrees to take [it]".  (Tr. 465).  A state agency psychologist and physician reviewed the updated evidence in the file and affirmed the prior assessments as written, also in April 2006.  (Tr. 233, 249, 258).

Medication records from the Nord Center indicated Plaintiff's approval for low-cost pharmacy benefits was discontinued in May 2006.  (Tr. 461).

In June 2006, plaintiff received treatment in the emergency room for a sprained ankle and bruise, reporting she had fallen down six steps.  (Tr. 310, 313).  She was discharged with instructions to take Naprosyn.  (Tr. 312).  That month, a counselor from the Nord Center called Plaintiff regarding her non-compliance.  (Tr. 463-64).  Plaintiff reported she was "stable", did not "need 'talk therapy'", and only wanted to be on medications.  (*Id.*).  Plaintiff failed to keep her appointments with Dr. Saini and the staff nurse on August 1 and 22, 2006.  (Tr. 460, 462).  Plaintiff did not return "multiple messages to see if she ha[d] med[ications]".  (Tr. 460).

On August 14, Plaintiff complained of right shoulder, hip, and toe pain after falling down three steps.  (Tr. 318).  X-rays confirmed she had no fractures, and she was ambulatory and feeling "much better" when she was discharged from the emergency room.  (Tr. 320, 323-34).  On August 16, Plaintiff complained of parasthesia in her right leg, but Dr. Schroeder noted she exhibited normal nerves, reflexes, and sensations during neurological examination.  (Tr. 441).

On August 31, 2006 Plaintiff returned to the Nord Center – her first visit since April 2006.  (Tr. 459).  Plaintiff admitted to being "very sporadic about her medication".  (*Id.*).  A week later, she told Dr. Saini she had been "down in the dumps" after running out of Paxil about two and a half

5

weeks earlier.  (Tr. 458).

In October 2006, Plaintiff told Dr. Schroeder her legs ached and throbbed in the evenings. (Tr. 440).  But her nerves, reflexes, and sensations were normal during physical examination. (*Id.*). Dr. Schroeder prescribed Elavil for Plaintiff's neuropathy and ibuprofen for her menstrual pain. (*Id.*).  In November 2006, Dr. Schroeder noted decreased vibratory sensation during neurological examination and a diagnosis of diabetic neuropathy, for which she again recommended Elavil.  (Tr. 443).

In October and November 2006, Plaintiff reported feelings of hopelessness to Dr. Saini, but denied suicidal thoughts.  (Tr. 455-56).  She admitted in October she had been out of medications for a few weeks because she had not turned in the necessary paperwork to receive low-cost pharmacy benefits, and stated in November she did not take Cymbalta because it made her vomit. (Tr. 455-57).  Dr. Saini prescribed her Zoloft instead.  (Tr. 455).  In January 2007, a Nord Center nurse noted Plaintiff had recently missed another appointment with Dr. Saini.  (Tr. 454).  Plaintiff admitted she had not taken Zoloft in about a month, stating she forgot to pick it up from the pharmacy and she did "not really feel depressed[,] just a little frustrated some times about the pain in her legs from the neuropathy".  (*Id.*).

In April 2007, Dr. Saini observed Plaintiff had a depressed mood and nervous affect, but denied suicidal thoughts.  (Tr. 453).  Dr. Saini noted Plaintiff had "been non-compliant for [a] long time [and] now agrees to restart med[ication]s".  (*Id.*).  In June 2007, Dr. Saini noted Plaintiff was cooperative, calm, and "OK", and denied suicidal thoughts.  (Tr. 483).

On July 13, 2007, Plaintiff visited the emergency room after falling.  (Tr. 515).  X-rays of her leg and foot were negative.  (Tr. 517-18).  On July 29, 2007, Plaintiff returned to the emergency

room, where she was diagnosed with right shoulder bursitis. (Tr. 512).

In August 2007, Dr. Saini noted Plaintiff denied feeling hopeless or helpless and was stable. (Tr. 482). That month, Plaintiff hurt her left knee and right arm after tripping in her yard. (Tr. 506). She visited the emergency room, where she reported peripheral neuropathy and exhibited tenderness in her right shoulder, right paraspinal muscles into the supraspinal area, and left knee during physical examination. (Tr. 505). Examination notes also indicate she exhibited normal mood and affect, normal motor function, and good range of motion in her injured shoulder, knee, and elbow. (*Id.*). X-rays of her left knee and right elbow and shoulder were negative. (Tr. 507-09).

In October 2007, Dr. Saini noted Plaintiff denied suicidal thoughts. (Tr. 481). Plaintiff skipped her December 2007 appointment with Dr. Saini and did not attempt to reschedule it. (Tr. 480).

In January 2008, Nurse Practitioner Stephanie Lorenson of Lorain County Health and Dentistry prescribed diabetes medication, Trazadone, and Neurontin. (Tr. 488).

In February 2008, Plaintiff told a Nord Center nurse she wanted to return for services, stating she "feels that she really does need medication [for depression] because she functions better with it". (Tr. 495). During her visit with Dr. Saini later that month, Plaintiff denied feeling hopeless or helpless or having suicidal thoughts. (Tr. 491).

On April 10, 2008, Plaintiff visited the emergency room, where she was diagnosed with bursitis and given corticosteroid medication. (Tr. 487, 501). Her physical examination revealed normal neurological findings, including normal deep tendon reflexes, gait, and motor and sensory functions. (Tr. 502). Five days later, Plaintiff followed up with Nurse Practitioner Lorenson for further treatment for her right arm. (Tr. 487). She reported she had stopped taking Neurontin

7

because it made her feel weak. (*Id.*). Nurse Practitioner Lorenson prescribed Ultram for pain. (*Id.*).

On April 22, 2008, Plaintiff reported to Dr. Saini that Zoloft worked "well". (Tr. 490). Dr. Saini noted Plaintiff was cooperative and exhibited an "OK" mood, had no suicidal ideations, and was "stable". (*Id.*).

*Administrative Hearing*

At the hearing before the ALJ, Plaintiff testified she left her last job as a security guard because she took time off to have all her teeth extracted, but then became depressed because of her appearance. (Tr. 29). She testified she fell once every month or two. (Tr. 33).

The ALJ asked vocational expert Thomas Nimberger to describe Plaintiff's past relevant work. (Tr. 40). Mr. Nimberger identified the Department of Labor codes and skill levels of five previous jobs, including fast-food worker, a light, unskilled job with a skill level of two. (Tr. 40-41).

**Standard of Review**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a

8

preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## Standard for Disability

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age,

9

education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## Discussion

Plaintiff raises three challenges to the ALJ's decision:

> 1. the ALJ erred by finding Plaintiff did not meet Listing 12.05;
> 2. the ALJ failed to accurately account for Plaintiff's peripheral neuropathy in his RFC finding; and
> 3. the ALJ should have limited Plaintiff to "simple, routine tasks" in his RFC finding, thus disqualifying her from her past work as a fast food worker.

(Doc. 12, at 9-11). For the reasons described below, these challenges do not succeed.

*Listing 12.05*

Plaintiff argues she met the requirements of Listing 12.05(C) for mental retardation due to her full-scale IQ score of 75. (Doc. 12, at 10). She is incorrect.

Listing 12.05 indicates "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpt. P, App'x 1, § 12.05. The Listing further requires a claimant have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* at § 12.05(C).

Plaintiff argues her IQ score of 75 is within a standard deviation of the 60 to 70 range required under the Listing. Similar arguments have been rejected by the Sixth Circuit. *See Newland*

*v. Apfel*, 1999 WL 435153, at *6 (6th Cir. 1999) (the court "considered and rejected the 'margin of error' argument because the Commissioner's regulations do not provide for functional equivalency when test scores are specified" and furthermore, the claimant was diagnosed with "borderline intellectual functioning, not mental retardation."). Further, like the *Newland* claimant, Plaintiff was never diagnosed with mental retardation, only borderline intellectual functioning. (Tr. 186, 214, 236-37). Therefore, the ALJ had substantial evidence to conclude Plaintiff did not meet the Listing, both because her IQ score is outside the range required by the listing, and because she was never diagnosed with mental retardation.

*RFC Finding – Plaintiff's Peripheral Neuropathy*

Plaintiff argues the ALJ erred by relying "entirely on the opinion of a consultative examiner concerning her" RFC relating to her peripheral neuropathy. (Doc. 12, at 9). Plaintiff argues the ALJ omitted any consideration of the opinions of her treating neurologist Dr. Mahajan, emergency room physicians, and her physician at Lorain County Health and Dentistry, all of which, Plaintiff argues, support Plaintiff's subjective description of her impairments due to peripheral neuropathy. (*Id.*).

Although an ALJ is "required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Baranich v. Barnhart*, 128 F. App'x 481, 488-89 (6th Cir. 2005) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). Therefore, failing to discuss the opinions of Dr. Mahajan, the emergency room doctors, and the Lorain County physician is not, by itself, error.

Furthermore, the evidence cited by Plaintiff does not support limitations greater than those found by the ALJ. Plaintiff cites findings of decreased sensation in her extremities in July and August 2005. (Tr. 326, 339). But despite Plaintiff's decreased sensation and complaints of

11

weakness, she exhibited 4/5 to 5/5 muscle strength, and normal reflexes, cervical spine range of motion, and gait.  (*Id.*).  Treatment records often indicated her sensory function was normal.  (Tr. 224 (April 2006), Tr. 441 (August 2006), Tr. 440 (October 2006), & Tr. 502 (April 2008)).

Likewise, though Plaintiff fell four times between 2006 and 2007, the minor injuries she sustained do not demonstrate lasting limitations precluding her from performing light exertional work.  In June 2006, Plaintiff was discharged with pain medication for her bruised and sprained ankle.  (Tr. 310-13).  In August 2006, Plaintiff was discharged as ambulatory and feeling "much better".  (Tr. 320, 323-34).  Plaintiff sustained no fractures from her July 2007 fall, and had no related complaints two weeks later.  (Tr. 511-12, 515-18).  After a fall in August 2007, she still exhibited normal motor function and good range of motion in her injured shoulder, knee, and elbow, and had no fractures.  (Tr. 505-09).

Finally, although Plaintiff argues EMG findings contradicted the ALJ's RFC finding, the treatment note she cites only states "EMG - Diabetic neuropathy occ ETOH".  (Tr. 440).  This note does nothing more than confirm Plaintiff's diagnosis of neuropathy, which the ALJ recognized as a severe impairment.  (Tr. 15). Plaintiff's arguments fail to demonstrate the ALJ's RFC finding for light exertional work was not supported by substantial evidence.

Plaintiff also criticizes the ALJ for relying heavily on the opinion of consultative examiner Dr. Al-Turk, but admits no treating physician provided an opinion regarding her functional abilities. (Doc. 12, at 9, 14).  The ALJ considered treatment records of Plaintiff's treating sources, including neurologist Dr. Mahajan and Nurse Practitioner Stephanie Lorenson (Tr. 15-16, 37-38), but Dr. Al-Turk conducted the most comprehensive examination in the record and was the only examining doctor to offer an opinion about Plaintiff's physical limitations.  Therefore, the ALJ reasonably

relied on his findings and opinion.  (Tr. 19-20).

*Past Work as Fast Food Worker and RFC Finding – Simple, Routine Tasks*

Plaintiff argues the ALJ failed to explain why he disregarded evidence that she was limited to simple, routine tasks, or limited to activity performed in a familiar environment with low stress and minimal demands.  (Doc. 12, at 10-11).  Plaintiff also argues the demands of a fast food worker "do not appear to fall within these limitations."  (Doc. 12, at 11).

Contrary to Plaintiff's allegations, the ALJ *did* limit Plaintiff to "only simple, routine tasks". (Tr. 18).  The ALJ supported this limitation by the opinions of Dr. Zeck and Dr. DeMuth, and evidence that Plaintiff required only sporadic mental health treatment.  (Tr. 18-20).  Dr. Zeck opined that, even with Plaintiff's borderline intellectual functioning and depression, her mental ability to maintain attention, concentration, persistence, and pace for simple, repetitive tasks was not impaired, and she was capable of comprehending and doing simple, routine tasks at home and in the community.  (Tr. 214).  Similarly, Dr. DeMuth opined that Plaintiff would be capable of simple, routine tasks in a familiar environment.  (Tr. 249).  Thus the mental limitation found by the ALJ was supported by expert opinions – substantial evidence.  Also, by concluding Plaintiff could not perform her past semi-skilled jobs, the ALJ recognized Plaintiff was more limited than she was in the past.  (Tr. 21, 40-41).

Plaintiff argues the ALJ's RFC finding should have also limited her to a low stress setting with minimal demands, but substantial evidence supports the ALJ's assessment that further limitations were not warranted.  (Tr. 18-20).  Treatment notes indicate, and Plaintiff admitted, that she did poorly without medication but was "stable when she took her medication".  (Tr. 20).  In September 2006, she told Dr. Saini she had been "down in the dumps" after running out of Paxil

13

about two weeks earlier.  (Tr. 458).  In October and November 2006, although Plaintiff reported feelings of hopelessness to Dr. Saini, she admitted she had been out of medications for a few weeks. (Tr. 455-57).  In contrast, in June, August, and October 2007, Plaintiff appeared to be compliant with treatment and was "calm" and "OK", had no feelings of hopelessness or helplessness, and was "stable" (Tr. 481-83); other records from August 2007 also indicate Plaintiff's mood and affect were normal.  (Tr. 505).

As the ALJ noted, Plaintiff had "a history of not always complying with recommended and prescribed treatment". (Tr. 20).  There were several long periods when Plaintiff declined to pursue mental health services: between late October 2005 and February 2006 (Tr. 171-88, 467, 470-75), April 2006 and August 2006 (Tr. 465, 459), and October 2007 and February 2008 (Tr. 480-81, 495). When Plaintiff declined Nord Center services, she explained she was "stable" and did not "need 'talk therapy'" (463-64) and she did "not really feel depressed" (Tr. 454).  Plaintiff's sporadic mental health treatment history and her improvement with medication support that Plaintiff's depression did not warrant limitations beyond those found by the ALJ.  (Tr. 20).  *See* 20 C.F.R. 404.1529(c)(3)(iv)-(v) (authorizing an ALJ to consider a claimant's course of treatment and use of medications when evaluating pain and functional limitations).

Furthermore, the ALJ reasonably concluded Plaintiff's past work as a fast food worker accommodated her limitation to "simple, routine tasks."  (Tr. 18, 21).  The VE testified Plaintiff's past job as a fast food worker was "light and unskilled".  (Tr. 41).  A limitation to "simple, repetitive, and routine tasks, within the category of light work, simply means that [the claimant] is limited to unskilled light work." *Allison v. Comm'r of Soc. Sec.*, 2000 WL 1276950, at *4 (6th Cir. 2000) (citing 20 C.F.R. § 404.1568(a)) ("Unskilled work is work which needs little or no judgment

14

to do simple duties that can be learned on the job in a short period of time."). Here, the ALJ found Plaintiff's "past relevant work as a fast food worker, which is *light, unskilled work* . . . does not require the performance of work-related activities precluded by her residual functional capacity . . . the work is *simple and routine* . . . ." (Tr. 21) (emphasis added). Because unskilled work accommodates a limitation to "simple, routine tasks", the ALJ reasonably concluded Plaintiff could return to her past work as a fast food worker. To the extent Plaintiff challenges this conclusion because she believes the ALJ's RFC findings regarding her neuropathy and mental limitations were wrong, that challenge fails because the RFC is supported by substantial evidence as described above.

### Conclusion and Recommendation

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying DIB and SSI benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

                                                             s/James R. Knepp II
                                                             United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).